IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| SIERRA CLUB, et al.,  )<br>                                      )<br>              Plaintiffs,  )    Civil No. 03-1697-HO<br>                                      )    Lead Case<br>      and                        )    (Consolidated Case No.<br>                                      )     06-6071-HO)<br>UNITED STATES OF AMERICA,  )<br>                                      )<br>              Intervenor,  )<br>       v.                         )    FINDINGS OF FACT and<br>                                      )    CONCLUSIONS OF LAW<br>                                      )<br>MASTEC NORTH AMERICA, a private )<br>corporation, et al.,       )<br>                                      )<br>              Defendants.   ) | |

These cases involve alleged violations of the Clean Water Act (CWA) during the construction of a 60-mile natural gas pipeline and certain lateral pipelines in Coos and Douglas Counties, Oregon. Plaintiffs Sierra Club, Coos County Coalition, and Klamath-Siskiyou Wildlands Center have resolved their portion of the case. The only portion of the case that remained for trial involved the government's allegations of CWA liability against MasTec.

In November of 2000, Coos County applied for authorization from the United States Army Corps of Engineers to install the pipeline

pursuant to 33 U.S.C. § 1344 (section 404 permit). The corps granted authorization under the terms and limitations of Nationwide Permit 12 for utility line activities and issued a permit to Coos County. The pipeline runs from a location near Roseburg, Oregon to Coos Bay, Oregon, and is 12 inches in diameter.

On March 25, 2003, Coos County applied for a permit for a 17-mile lateral pipeline system to consist of: (1) a 6-inch pipe branching off the mainline pipe at Fairview and extending 8.7 miles to Johnson Mill, Oregon; (2) a 4-inch pipe from the end of the 6-inch pipe 2.2 miles north to Coquille, Oregon; and (3) a 4-inch pipe from the end of the 6-inch pipe 6 miles south to Myrtle Point, Oregon.

In June of 2003, defendant MasTec entered into a contract with Coos County to construct the pipeline. Mastec began building the right of way corridor later that month.

Beginning in the middle of September 2003, the Corps issued several notices of noncompliance and cease and desist orders to Coos County and Mastec for alleged violations of the permit. On November 14, 2003, the Corps alleged that the construction corridor at certain stream crossings had not been minimized to the maximum extent possible, in violation of the permit's Regional Condition 7.

By the middle of November, MasTec had completed most of the 188 stream crossings identified in the permit. MasTec ceased operations in December of 2003. Coos County terminated MasTec from the contract in April of 2004, and hired Rockford Corporation to complete the pipeline.

2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

The United States intervened in this case asserting violations of the CWA permit at more than 165 streams and/or wetlands constituting waters of the United States. The United States also asserted that MasTec discharged dredged or fill material (constituting pollutants) into more than 15 streams and/or wetlands, that are waters of the United States, without a section 404 permit. After the trial, the government asserted MasTec's construction activities violated one or more permit conditions at 171 stream crossings on the mainline totaling 608 separate violations of the CWA and that MasTec performed work in streams without any permit when it built sections of the lateral lines. Additionally, the government asserted that MasTec installed sections of the lateral lines in a manner that would have violated permit conditions had the permit been in effect at the time MasTec undertook the work. The government contends that MasTec's violations caused destruction of stream channels, riparian vegetation, and massive erosion resulting in adverse impacts to the Umpqua River system, the Coquille River system, and the Coos Bay watershed and the fish populations within those systems.

At trial the government had the burden of demonstrating CWA violations by showing defendants caused discharge of a pollutant into navigable waters from a point source without a discharge permit (or in violation of a permit). <u>Committee To Save Mokelumne River v. East Bay Mun. Utility Dist.</u>, 13 F.3d 305, 309 (9th Cir. 1993).

The permit for the project contained conditions regarding the construction of the pipeline in and around streams the pipeline

3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

crossed. At trial, the government successfully demonstrated many violations. For instance, MasTec left fill material in streambeds, raising channels above preconstruction grade, which caused erosion.

Specific conditions violated include: failure to minimize construction boundaries to the maximum extent practicable and failure to clearly mark the boundary before beginning work; failure to install or maintain practicable erosion controls; failure to conduct in-water work during the appropriate time frames; failure to properly remove excess fill material and dispose of it so as to prevent discharge into waterways or wetlands; operating heavy equipment directly in streams and wetlands; using riprap where it was practical to use vegetation and organic materials; failure to restore sites to original grade and contours; and failure to use topsoil to fill in trenches in wetland areas.

MasTec argues an exemption applied to hundreds of crossings and that some of the alleged violations occurred in non-jurisdictional waters. MasTec's arguments are not well-taken. Nonetheless, with respect to civil penalties, the government demands far exceed what is fair and equitable.

A.   Culvert Crossings

MasTec asserts that its work at culvert crossings cannot constitute CWA violations.

A majority of the crossings identified in the mainline portion of the project involved culverts that needed to be replaced. The County requested MasTec's assistance in their replacement.

Under 33 U.S.C. § 1344(f)(1)(B), discharge of dredged or fill material for the purpose of maintenance of transportation structures is not prohibited by the CWA. However, exceptions to CWA liability are construed narrowly. United States v. Akers, 785 F.2d 814, 819 (9th Cir. 1986). To the extent MasTec's activities involved replacing culverts, that activity was not the main focus of the project. MasTec only incidentally replaced culverts in its efforts to install a natural gas pipeline under the culverts. MasTec's activities were, of course, far beyond the purpose of maintenance or replacement of serviceable structures. Thus, the exception is inapplicable. See United States v. Moses, 496 F.3d 984, 992 (9th Cir. 2007) (narrow construction of maintenance exception excludes application where activities went beyond mere maintenance of serviceable structures).

Nonetheless, it is worth noting that MasTec, the Army Corps of Engineers, and Coos County understood that the project also involved replacing culverts at many crossings and that MasTec and Coos County had reason to believe that replacement of culverts did not require a permit. See, e.g., Exhibit 47 (#286) to MasTec's closing argument at Tab 47, Book 2.

B.   Jurisdictional Waters

MasTec contends that many of the alleged violations occurred at crossings that lack a significant nexus to waters that are navigable in fact or reasonably could be made so.  As noted above, it is the government's burden to show that MasTec discharged pollutants into navigable waters.  The CWA defines navigable waters as waters of the United States. 33 U.S.C. § 1362(7).  Waters of the United States include: all interstate waters including interstate wetlands; other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce; tributaries of such waters; and wetlands adjacent to such waters.  33 C.F.R. § 328.3.  Even tributaries that flow intermittently are waters of the United States.  <u>Headwaters v. Talent Irrigation Dist.</u>, 243 F.3d 526, 534 (9th Cir. 2001).  It does not matter that a stream, at the time of the activity, is or is not discharging water continuously into navigable waters as long as it would flow into such water.  <u>Id.</u>

The government established that there are tributaries at many of the crossings that are part of a contiguous network of waters within the Umpqua River, Coquille River, or Coos Bay watershed which are navigable waters.  Some of the tributaries are intermittent. Additionally, the government established that other crossings

constitute adjacent wetlands that at least affect the physical, chemical and biological integrity of traditional navigable waters.

However, MasTec did provide evidence of difficulty recognizing many of the crossings as jurisdictional due to faulty maps and dry conditions.

## C.  Penalties

> In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d).

The maximum civil penalty is $27,500 per day for each violation. 40 C.F.R. § 19.4.

### 1.  History of Violations

MasTec has never been charged with or found liable for violating the CWA prior to this suit.  Although MasTec had little experience installing gas pipelines, it had performed thousands of underground infrastructure projects in the years prior to this undertaking.  The violations of this project were large in number and of some duration. However, the lack of guidance and notice from the Army Corps of Engineers, despite inspections revealing violations, mitigates MasTec's project specific history of violations.  The court finds the lack of prior violations to be significant.

7 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

2.   Good Faith

Although the evidence did show that MasTec often disregarded its duty to minimize construction boundaries to the maximum extent practicable and to install erosion controls, the evidence also demonstrated a significant lack of guidance from the Army Corps of Engineers. Indeed, the government suggested a need to neck down at stream bed crossings relative to upland areas after completion of trenched cross-country crossings. Moreover, it can be difficult to determine what is practical in terms of costs especially in light of the government's assertion that MasTec avoided more than $6,000,000 in costs by failing to implement "practical" measures. While it is true that MasTec failed to enlist the services of someone with CWA permit experience for this type of project, the County and the government also played a significant role in facilitating permit condition failures. However, MasTec's failure to familiarize itself with the permit until one month after construction began does cut against good faith to some extent.

The terrain was often extremely difficult to navigate and even more difficult to conduct clearing, leveling, and trenching work. Of course, erosion and turbidity in stream crossings cannot be completely eliminated in such a project. Nonetheless, there were areas of erosion control that MasTec could have and should have implemented better. However, during some of the project, the government barely voiced any concerns. It should also be noted that although MasTec did violate the in-water work period, there was evidence to suggest that

MasTec did so in good faith reliance on an interpretation that permitted such work in dry conditions.[1] Moreover, it is unclear just how effective any further action would have been in controlling sediment mobilization. Still, MasTec's failure to familiarize itself with the law regarding jurisdictional waters does cut against good faith to a certain extent, especially in light of the work on lateral lines before the County obtained a permit.

MasTec faced further complications due to a lack of alignment sheets and staked crossings because they were not prepared by the County. This, combined with a liberal definition of jurisdictional waters, certainly contributed to the violations and support a finding of some good faith efforts despite numerous violations. MasTec faced further challenges as a result of the County's failure to provide spoils disposal sites. However, MasTec had responsibility to comply with the permit conditions even absent greater County input. Although an environmental management system is not a legal requirement, MasTec's lack of one in such a complex undertaking cuts against a finding of good faith to an extent as well. Corporate management practices such as those implemented, or disregarded, by MasTec could lead to environmental harm.

As noted above, the government demonstrated that preconstruction contours were not maintained at many streambeds, but the differences

---

[1] The evidence demonstrated that 2003 was a particularly dry year through October. However, the testimony of Clark Besack also demonstrated that MasTec was unaware that dry stream beds could constitute jurisdictional waters. Nonetheless, Justin Simms of the Corps failed to enlighten MasTec during some on-site inspections.

9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

were not generally significant. Furthermore, the Corps provided little guidance, much of which occurred after the fact.[2] The good faith factor works in favor of MasTec to some extent.

### 3.  Seriousness of the Violations

There was little evidence of serious environmental harm. Significantly, there was no evidence of harm to fish habitat tied to MasTec's activities.

However, MasTec's permit violations were numerous and occurred over the length of the project. MasTec also discharged a small amount of fill material into water bodies along the lateral lines without any permit. In addition, actual environmental harm is often difficult to quantify and lack of environmental harm does not necessarily mitigate seriousness.

Although it cannot be calculated with complete accuracy, the government's assertion of thousands of total violation days is reasonable.[3] The violations, for the most part, resulted in minimal impact. Nonetheless, the viability of the general permitting program necessitates a significant penalty given the potential for great harm that can result from such prolonged violations.

---

[2] It should be noted that there were, however, occasions where County representatives identified riparian areas and wetlands and MasTec failed to exercise proper erosion control practices.

[3] The court does note that a single operational upset which leads to simultaneous violations of more than one pollutant parameter is treated as a single violation. 33 U.S.C. § 1319(d).

10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 4. Economic Benefit to MasTec

Of course an entity that violates the CWA should not reap an economic benefit from that violation. The parties diverge greatly in the assessment of economic benefit that resulted from noncompliance. MasTec asserts that it enjoyed no economic benefit. The government asserts that MasTec avoided more than $6,000,000 in costs necessary to comply with the CWA.

The government provided expert testimony estimating the cost of installing stream crossings in compliance with the permit on the mainline at $1,174,912 (less the *estimated* cost incurred by MasTec of $253,918) resulting in an economic benefit of $920,994 on the cross-country segments of the mainline. The government's calculation for the lateral lines resulted in an additional benefit of $94,688.

The government similarly calculated a benefit of $2,152,414 as a result of failure to comply with pre-construction contour and erosion control requirements. In addition, the government asserted a savings of $2,070,600 for failure to comply with the permit along the Coos Bay Wagon Road. Finally, the government asserted a savings of $1,189,597 in interest from the violations.

The evidence showed that MasTec incurred significant losses on this project overall. These losses included remediation costs for work directed by the Corps and non-payment by the County related to the issuance of notices of non-compliance from the Corps to MasTec regarding the permit violations. MasTec lost $9,230,000 on the project. MasTec also is liable to other entities for the violations

11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

beyond the $9,230,000 such as payment of $68,096 to the Oregon Department of Environmental Quality for penalties.

Of course some of MasTec's losses can be attributed to its failure to familiarize itself with permit requirements at the outset and failure to complete the project. Nonetheless, the government's position demonstrates that it either seeks more than was required by the permit to minimize construction boundaries to the maximum extent practicable and to install or maintain practical erosion controls, or that the benefit is simply overstated and duplicative. The economic benefit calculations by the government are simply too unreliable to be of any use in setting a penalty. The court finds little significance with respect to this factor.

### 5.   Economic Impact on the Violator

The court is aware that a sufficient penalty is necessary to prevent future violations and to prevent the violator from simply viewing the penalty as an acceptable cost of doing business for an environmental trade-off. Additionally, MasTec has not provided sufficient evidence of an inability to pay.

### 6.   Penalty Calculation

Regardless of whether the court employs a "bottom-up" or a "top-down" calculation, the government seeks a penalty far in excess of what is necessitated by the violations. The government's most conservative "bottom-up" approach yields a penalty of $12,688,774 to

12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

$19,033,161. In setting a fair and equitable penalty, the court notes that the government settled its case with Coos County for $75,000 cash, $525,000 in supplemental environmental projects, and approximately $1,600,000 to remediate damaged riparian areas and wetlands.[4] In this case, there was a failure of all parties concerned. Although MasTec is ultimately responsible for its own violations and failures to abide by the CWA, the lack of communication had a serious impact. Accordingly, the court sets the penalty at $1,500,000.

## CONCLUSION

For the reasons stated above, the court finds in favor of the the United States and against the MasTec defendants on the United States' Clean Water Act claims. In addition, the MasTec defendants shall pay a penalty of $1,500,000 payable to the United States Treasury. The clerk is directed to enter judgment in favor of the United States and against the MasTec defendants.

DATED this ___19th___ day of February, 2009.

                                                ___s/ Michael R. Hogan___
                                                United States District Judge

---

[4] The court notes that Coos County has agreed to a good faith settlement with MasTec under which MasTec will pay the County $8,700,000 which includes reimbursing the County for at least $2,200,000 for environmental damage MasTec caused that Coos County has to remediate. Additionally, MasTec has agreed to forgo, among other things, approximately $1,100,000 for environmental cleanup it performed.